**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

Andrew Albert,                                              )
                                                           )
                          Plaintiff,                       )
                                                           )          Case No. 1:20-cv-901-WCG
            v.                                             )
                                                           )
Oshkosh Corporation, *et al.*,                             )
                                                           )
                          Defendants.                      )


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Deborah S. Davidson
Morgan, Lewis & Bockius LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: 312.324.1159
Fax: 312.324.1001
deborah.davidson@morganlewis.com

Bernard J. Bobber
Kevin J. Kinney
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1243 North 10th Street, Suite 200
Milwaukee, WI 53205
Telephone: 414.239.6300
Fax: 414.755.8289
bernard.bobber@ogletree.com
kevin.kinney@ogletree.com

Jeremy P. Blumenfeld
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: 215.963.5258
Fax: 215.963.5001
jeremy.blumenfeld@morganlewis.com

Mark E. Schmidtke
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
56 S. Washington Street, Suite 302
Valparaiso, IN 46383
Telephone: 219.242.8668
Fax: 219.242.8669
mark.schmidtke@ogletree.com

Matthew J. Sharbaugh
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  202.739.5623
Fax:  202.739.3001
matthew.sharbaugh@morganlewis.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     RELEVANT FACTUAL BACKGROUND ........................................... 3

    A.      Oshkosh Corporation And The Plan ................................................ 3

    B.      Plaintiff Andrew Albert ................................................................... 6

    C.      Plaintiff's Claims ............................................................................ 7

III.    DISCUSSION .................................................................................... 7

    A.      Legal Standards Governing Motion To Dismiss ............................ 7

    B.      Seventh Circuit Precedent Forecloses Plaintiff's Claims That Oshkosh
    Breached Its Fiduciary Duties In Administering The Plan ................. 9

        1.   Plaintiff's Preference For Low-Cost And Passively-Managed
        Investments Fails To Plausibly Demonstrate Imprudence ............................ 11

        2.   Plaintiff's Criticism About The Share Classes Of Certain Investments
        Fails To Plausibly Demonstrate Imprudence ................................. 13

        3.   Plaintiff's Dissatisfaction With The Plan's Recordkeeping Fees Fails
        To Plausibly Demonstrate Imprudence ........................................ 17

        4.   Plaintiff's Dissatisfaction With The Fees Paid To The Plan's
        Investment Advisor Fails To Plausibly Demonstrate Imprudence ............... 20

    C.      Plaintiff's Bootstrapped Disloyalty Claims Are Not Plausible ..................... 21

    D.      Plaintiff Fails To State A Plausible Failure-To-Monitor Claim ................... 22

    E.      Plaintiff Fails To State Plausible Prohibited-Transaction Claims ................ 22

    F.      Plaintiff Lacks Standing To Challenge Investments He Never Selected ....... 24

IV.     CONCLUSION .................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................8, 18

*Chesemore v. Alliance Holdings Inc.,*
886 F. Supp. 2d 1007 (W.D. Wis. 2012) ................................................................21

*Cunningham v. Cornell Univ.,*
2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) .......................................................23

*Danza v. Fid. Mgmt. Tr. Co.,*
533 F. App'x 120 (3d Cir. 2013) ............................................................................24

*David v. Alphin,*
817 F. Supp. 2d 764 (W.D.N.C. 2011) ...................................................................26

*Davis v. FEC,*
554 U.S. 724 (2008) ................................................................................................24

*Dezelan v. Voya Ret. Ins. & Annuity Co.,*
2017 WL 2909714 (D. Conn. July 6, 2017) .....................................................24, 26

*Divane v. Nw. Univ.,*
2018 WL 2388118 (N.D. Ill. May 25, 2018) .......................................................2, 11

*Divane v. Nw. Univ.,*
953 F.3d 980 (7th Cir. 2020) ........................................................................ *passim*

*Fifth Third Bancorp v. Dudenhoeffer,*
573 U.S. 409 (2014) ..................................................................................................8

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,*
530 U.S. 238 (2000) ................................................................................................22

*Hecker v. Deere & Co.,*
556 F.3d 575 (7th Cir. 2009) ........................................................................ *passim*

*Hightshue v. AIG Life Ins. Co.,*
135 F.3d 1144 (7th Cir. 1998) ................................................................................21

*Howell v. Motorola, Inc.,*
633 F.3d 552 (7th Cir. 2011) ..................................................................................22

Case 1:20-cv-00901-WCG   Filed 10/05/20   Page 3 of 32   Document 26

# TABLE OF CONTENTS
(continued)

*Johnson v. Delta Air Lines, Inc.*,
2017 WL 10378320 (N.D. Ga. Dec. 12, 2017)......................................................26

*Leimkuehler v. Am. United Life Ins. Co.*,
713 F.3d 905 (7th Cir. 2013) .........................................................................5

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996).....................................................................................22

*Loomis v. Exelon*,
658 F.3d 667 (7th Cir. 2011) ............................................................ *passim*

*Marks v. Trader Joe's Co.*,
2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ...........................................4

*Marshall v. Northrop Grumman Corp.*,
2017 WL 2930839 (C.D. Cal. Jan. 30, 2017) .........................................26

*Marshall v. Northrop Grumman Corp.*,
2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ........................................23

*Martin v. CareerBuilder, LLC*,
2020 WL 3578022 (N.D. Ill. July 1, 2020)................................... *passim*

*Patrico v. Voya Fin., Inc.*,
2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018) ........................................23

*Patterson v. Morgan Stanley*,
2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .......................................4, 26

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.
Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)..........................................................................8

*Ramos v. Banner Health*,
-- F. Supp. 3d --, 2020 WL 2553705 (D. Colo. May 20, 2020)..............23

*Rogers v. Baxter Int'l Inc.*,
710 F. Supp. 2d 722 (N.D. Ill. 2010) .......................................................22

*Sacerdote v. N.Y. Univ.*,
2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017).........................15, 22, 23, 24

*Sellers v. Anthem Life Ins. Co.*,
316 F. Supp. 3d 25, 34 (D.D.C. 2018) ..............................................23, 24

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .................................................................................... 24

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020) ............................................................................... 25, 26

*United Transp. Union v. Gateway W. Ry. Co.*,
  78 F.3d 1208 (7th Cir. 1996) .......................................................................... 25

*White v. Chevron Corp. ("White III")*,
  752 F. App'x 453 (9th Cir. 2018) ..................................................................... 8

*White v. Chevron Corp. ("White I")*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ............................................... 12

*White v. Chevron Corp. ("White II")*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017) ........................................... 7, 15

*White v. Marshall & Ilsley Corp.*,
  714 F.3d 980 (7th Cir. 2013) .......................................................................... 14

*Wilcox v. Georgetown Univ.*,
  2019 WL 132281 (D.D.C. Jan. 8, 2019) ........................................................ 26

*Wildman v. Am. Century Servs., LLC*,
  2018 WL 2326627 (W.D. Mo. May 22, 2018) ................................................. 6

*Yost v. First Horizon Nat'l Corp.*,
  2011 WL 2182262 (W.D. Tenn. June 3, 2011) ............................................... 26

**STATUTES**

29 U.S.C. § 1002 ............................................................................................ 4, 23

29 U.S.C. § 1104 ...................................................................................... 7, 21, 24

29 U.S.C. § 1106 ...................................................................................... 7, 22, 23

**OTHER AUTHORITIES**

29 C.F.R. § 2550.404a-5 ....................................................................................... 5

75 Fed. Reg. 64,910 (Oct. 20, 2010) ................................................................. 16

Fed. R. Civ. P. 12(b)(6) ............................................................................. *passim*

Case 1:20-cv-00901-WCG   Filed 10/05/20   Page 5 of 32   Document 26

# I.   **INTRODUCTION**

This is one of the latest in a rising tide of class-action lawsuits against 401(k) plan fiduciaries that the Seventh Circuit has rejected as "paternalistic." *E.g.*, *Loomis v. Exelon*, 658 F.3d 667, 673 (7th Cir. 2011). This particular case, in fact, is part of its own wave of nine virtually identical cases filed by the same law firm in this District over the past several months alone.[1]

Plaintiff Andrew Albert is a participant in the Oshkosh Corporation and Affiliates Tax Deferred Investment Plan (the "Plan"). Through his Amended Complaint, he asserts claims against Oshkosh Corporation, the Oshkosh Board of Directors, and the Plan's Administrative Committee (together, "Oshkosh"), alleging that Oshkosh breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff's primary theory is that Oshkosh should have offered only the cheapest investment options in the Plan, eschewing actively-managed investments that some participants may prefer based on their potential for higher investment returns or lower risk, generally in exchange for a slightly higher cost. Plaintiff also asserts that Oshkosh allowed the Plan to pay "excessive" recordkeeping fees because of his belief that the Plan should have assessed those fees on a per-participant, pro-rata basis, instead of as an asset-based charge through "revenue sharing." Even if these are Plaintiff's preferences for his retirement plan, his allegations do not state plausible claims under Seventh Circuit precedent.

---

[1] Five of those other cases are also pending on this Court's docket. *See Soulek v. Costco Corp.*, No. 1:20-cv-937-WCG (E.D. Wis., filed June 23, 2020); *Cotter v. Matthews Int'l Corp.*, No. 1:20-cv-1054-WCG (E.D. Wis., filed July 13, 2020); *O'Driscoll v. Plexus Corp.*, No. 1:20-cv-1065-WCG (E.D. Wis., filed July 14, 2020); *Glick v. Thedacare, Inc.*, 1:20-cv-1236-WCG (E.D. Wis., filed Aug. 12, 2020); *Laabs v. Faith Techs., Inc.*, No. 1:20-cv-1534-WCG (E.D. Wis., filed Oct. 2, 2020). Plaintiff's counsel filed the other three cases in the Milwaukee Division, so they are pending before different jurists. *See Bangalore v. Froedert Health, Inc.*, No. 2:20-cv-893-PP (E.D. Wis., filed June 12, 2020); *Nohara v. Prevea Clinic, Inc.*, No. 2:20-cv-1079-LA (E.D. Wis., filed July 16, 2020); *Woznicki v. Aurora Health Care, Inc.*, No. 2:20-cv-1246-PP (E.D. Wis., filed Aug. 14, 2020). Additionally, outside of this District, Plaintiff's counsel recently filed at least two similar cases in other Seventh Circuit courts. *See Marvin v. Mercy Health Corp.*, No. 3:20-cv-50293 (N.D. Ill., filed Aug. 6, 2020) (voluntarily dismissed on Aug. 28, 2020); *Lange v. Infinity Healthcare Physicians, S.C.*, No. 3:20-cv-737 (W.D. Wis., filed Aug. 7, 2020).

To start, the Court of Appeals has repeatedly emphasized that ERISA does not require retirement plan fiduciaries to "find and offer the cheapest possible fund[.]" *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming Rule 12(b)(6) dismissal of similar fiduciary breach claims). Instead, as the Seventh Circuit reaffirmed just a few months ago, fiduciaries satisfy their obligations under ERISA by offering a "range of investment options and fees[.]" *Divane v. Nw. Univ.*, 953 F.3d 980, 992 (7th Cir. 2020) (affirming Rule 12(b)(6) dismissal of similar fiduciary breach claims), *petition for cert. docketed*, No. 19-1401 (June 23, 2020); *see also Loomis*, 658 F.3d at 670 (same); *Hecker*, 556 F.3d at 586 (same). In this way, plan participants cannot co-opt ERISA to mandate their own "benefit program preferences" or to "guarantee[] … their own preferred investment options." *Divane*, 953 F.3d at 989.

These precedents dispose of Plaintiff's claims. Throughout the proposed class period, Oshkosh offered the Plan's participants a diverse menu of approximately 22 different investment options, with a range of fees spanning 0.035% to 1.08%—*lower* than the range of fees that the Seventh Circuit found reasonable as a matter of law in *Divane* (*i.e.*, 0.05% to 1.89%). *See Divane v. Nw. Univ.*, 2018 WL 2388118, at *3 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 980; *see also Hecker*, 556 F.3d at 581 (holding the same, where "[t]he expense ratios among the twenty primary funds range[d] from just over 1% to as low as .07%"). Plaintiff's penchant for the lowest-cost investment options cannot state a claim under ERISA, especially when the Plan consistently offered him (and all participants) the choice to allocate his retirement assets to precisely that sort of investment: a low-cost index fund with fees of 0.04% or less.

Plaintiff's conclusory assertion that the Plan's recordkeeping fees were "excessive"—and that the Plan should have paid no more than $40 per participant annually—are equally deficient. The Seventh Circuit rejected materially identical allegations in *Hecker*, 556 F.3d at 585-86;

2

*Loomis*, 658 F.3d at 672-73; and again in *Divane*, 953 F.3d at 990-91 (explaining that a "revenue sharing" structure can "benefit plan participants" and holding that the defendant "was not required to search for a recordkeeper willing to take $35 per year per participant"). This alone compels the dismissal of Plaintiff's claims. Further analysis only reinforces the point. While Plaintiff alleges that the Plan paid an average of $87 per participant in annual recordkeeping fees over the relevant period (Am. Compl. ¶ 100), that amount—even if true—falls far below the "$153 to $213 per year" the Seventh Circuit held reasonable in *Divane*. 953 F.3d at 984, 990-91. Plus, Plaintiff's proffered comparisons to the fees of "similar" plans (Compl. ¶ 101) are apples and oranges, *see infra* at 19-20, and do nothing to show that the Plan's fees were "excessive" or otherwise improper. Plaintiff's recordkeeping-fee claim fails for the same reasons as in *Divane*, *Loomis*, and *Hecker*.

Plaintiff's ancillary claims are equally implausible and without merit. He cannot state claims for breach of the duty of loyalty simply by piggybacking on the same allegations that underpin his imprudence claims. He cannot state "failure-to-monitor" claims without an underlying fiduciary breach. And he cannot invoke ERISA's prohibited-transaction rules to penalize Oshkosh for paying negotiated fees to the Plan's ordinary service providers.

For all of these reasons and those explained more fully below, Oshkosh respectfully requests that the Court dismiss Plaintiff's Amended Complaint in its entirety, with prejudice.

## II. RELEVANT FACTUAL BACKGROUND[2]

### A. Oshkosh Corporation And The Plan

Founded in 1917 in Oshkosh, Wisconsin, Oshkosh Corporation was built on the company's patent of the four-wheel drive system. For more than a century, Oshkosh has been manufacturing

---

[2] This summary comes from Plaintiff's allegations or from publicly available documents that Plaintiff references in the Amended Complaint, which are appropriately considered on a Rule 12(b)(6) motion. *See, e.g.*, *Hecker*, 556 F.3d at 582-83 (citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)). Specifically, the Court may consider fund prospectuses, the Plan's Forms 5500 filed with the Department of Labor

3

some of the industry's toughest specialty truck and access equipment (*e.g.*, fire and emergency, refuse hauling, concrete placement, and airport services vehicles, *see* Am. Compl. ¶ 19). Today Oshkosh employs more than 15,000 team members, many based in Wisconsin.[3]

One of the ways Oshkosh helps its employees prepare for retirement is through the Plan. The Plan is an individual-account, defined-contribution plan under ERISA, 29 U.S.C. § 1002(34). (*Id.* ¶ 26.) The Plan allows Oshkosh employees to save for retirement on a tax-deferred basis, with Oshkosh and its affiliates adding to those retirement savings through matching contributions. Between 2014 and 2018, Oshkosh contributed more than $165 million in employer-matching contributions to Plan participants.[4] As a defined-contribution plan, the Plan "allows participants to choose how their retirement assets will be invested." *Loomis*, 658 F.3d at 669. The Plan offers a diverse menu of 22 investment options that cover different asset classes, investment styles (actively-managed funds and passive "index" funds),[5] and risk-reward profiles.

Like all 401(k) plans, there are expenses associated with the Plan. These include: (1) investment-management fees, *i.e.*, "ongoing charges for managing the assets of the investment fund"; and (2) administrative or "recordkeeping" fees that encompass the "day-to-day" expenses for "basic administrative services … necessary for administering the plan as a whole."[6]

---

("DOL"), and the Plan's 404a-5 fee disclosures under ERISA. *See id.* (prospectuses and related materials); *see also, e.g.*, *Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *4 (C.D. Cal. Apr. 24, 2020) (Forms 5500); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019) (fee disclosures).

[3] *See* https://www.oshkoshcorp.com/story (last visited Oct. 5, 2020).

[4] *See* Ex. 1, 2014 Form 5500, Fin. Stmts. at 4 ($29,338,315 in employer contributions); Ex. 2, 2015 Form 5500, Fin. Stmts. at 4 ($32,191,299); Ex. 3, 2016 Form 5500, Fin. Stmts. at 4 ($31,762,170); Ex. 4, 2017 Form 5500, Fin. Stmts. at 4 ($32,184,273); Ex. 5, 2018 Form 5500, Fin. Stmts. at 4 ($39,666,611).

[5] With actively-managed funds, "investment advisers try to find and buy underpriced securities while selling ones that the advisers think are overvalued," with an eye toward beating the index. *Loomis*, 658 F.3d at 669-70. The associated work and resources render actively managed funds more costly than passively managed "index funds," which "do not make any independent investment choices but simply track a designated portfolio such as the Standard & Poor's 500 Index." *Id.*

[6] *See* Dep't of Labor, Understanding Retirement Plan Fees and Expenses at 3, 5 (Dec. 2011), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/

4

An investment option expresses its investment-management fee in the form of an "expense ratio"—*i.e.*, a percentage-based deduction against a participant's total assets in the investment. (Am. Compl. ¶ 174.)  For instance, a participant who invests $1,000 in a fund with an expense ratio of 0.04% pays an annual fee of 40 cents ($1,000 x 0.0004).  In addition, participants often pay for recordkeeping fees through the same expense ratios, instead of as a separate charge, through a process called "revenue sharing."  Revenue sharing is "an arrangement allowing mutual funds to share a portion of the fees that they collect from investors with entities that provide services to the mutual funds," like recordkeepers.  *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013); *Divane*, 953 F.3d at 989 n.9.  In the example above, the investment manager could pay a portion of the 0.04% expense ratio that it collects (*i.e.*, "sharing" some of its "revenue") to the plan's recordkeeper for services.  (Am. Compl. ¶ 51.)

The Plan uses a revenue-sharing model, which means that the total fees paid by participants (for investment management and recordkeeping) are reflected in the investments' expense ratios. In other words, "[t]he amount of fees paid [are] within the participants' control because they [can] choose which funds to invest the money in their account."  *Divane*, 953 F.3d at 991 n.10. Participants have access to these expense ratios, including through the recordkeeper's website, and the Plan regularly publishes and discloses the expense ratios to participants, including through quarterly account statements and annual disclosures issued pursuant to DOL regulations.  *See* 29 C.F.R. § 2550.404a-5.  Over the relevant period, the expense ratios for the Plan's investments have

---

understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 5, 2020).  Beyond these two general categories of fees, 401(k) plans or their recordkeepers often charge separate fees for individual plan transactions (*e.g.*, participant loans), but those types of individual fees are not at issue here.

ranged from just 0.035% to 1.08%, and the Plan has always included at least one low-cost index fund with an expense ratio of 0.04% or less (*i.e.*, 40 cents for each $1,000 invested).[7]

Like almost all 401(k) plan fiduciaries, Oshkosh contracts with a recordkeeper, Fidelity, to assist with the Plan's administration. (Am. Compl. ¶ 82.) As Plaintiff recognizes, the services of recordkeepers like Fidelity are "necessary for all defined contribution plans" and encompass a range of activities, including "maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services." (*Id.* ¶ 37.) Fidelity was of course compensated for its services to the Plan, through a combination of direct payments and indirect compensation—*i.e.*, revenue sharing. (*See* Exs. 1-5, Forms 5500, Sch. C (disclosing both direct and indirect compensation).) Fidelity also rebated back to the Plan hundreds of thousands of dollars in fees each year over the relevant period. (*See id.*, Fin. Stmts., "Other Income.")[8] The Plan also partnered with Strategic Advisors, Inc. ("SAI"), an independent provider of "investment advisory services." (Am. Compl. ¶ 206.) SAI received only direct fees for its services to the Plan, not indirect compensation through revenue sharing. (*See* Exs. 1-5, Forms 5500, Sch. C (disclosing only direct fees).)

## B. <u>Plaintiff Andrew Albert</u>

According to the Amended Complaint, Plaintiff Andrew Albert worked for an Oshkosh subsidiary from January 2018 until April 2020, and he "participated in the Plan." (Am. Compl. ¶¶

---

[7] *See* Ex. 6, 2014 404a-5 Discl. (expense ratios of 0.04%–1.08%); Ex. 7, 2015 404a-5 Discl. (0.04%–1.08%); Ex. 8, 2016 404a-5 Discl. (0.04%–1.02%); Ex. 9, 2017 404a-5 Discl. (0.04%–0.85%); Ex. 10, 2018 404a-5 Discl. (0.035%–0.85%); Ex. 11, 2019 404a-5 Discl. (0.035%–0.85%).

[8] Under a revenue-sharing structure, a recordkeeper often "rebates" back to the plan the unused portion of fees it collects through expense ratios, and those rebates "can be used to pay for services like third-party consultants, plan audits, or paid back to plan participants." *Wildman v. Am. Century Servs., LLC*, 2018 WL 2326627, at *2 (W.D. Mo. May 22, 2018). This occurred here. (*See* Ex. 1, 2014 Form 5500, Fin. Stmts. at 10, "Other Income" (disclosing $140,181 rebate from Plan trustee, Fidelity); Ex. 2, 2015 Form 5500, Fin. Stmts. at 9 ($313,725 rebate); Ex. 3, 2016 Form 5500, Fin. Stmts. at 9 ($267,000 rebate); Ex. 4, 2017 Form 5500, Fin. Stmts. at 9 ($649,545 rebate); Ex. 5, 2018 Form 5500, Fin. Stmts. at 9 ($923,207 rebate).)

6

11-14.)  Plaintiff does not allege any further detail regarding his participation in the Plan, such as which investment option(s) he selected for his retirement assets.

### C.    Plaintiff's Claims

Plaintiff's Amended Complaint asserts three sets of claims against Oshkosh.  In Counts I through III, Plaintiff alleges that Oshkosh breached its fiduciary duty of prudence under ERISA Section 404(a), 29 U.S.C. § 1104(a), by allegedly: (1) offering actively-managed investment choices in the Plan that he thinks were too expensive, instead of "lower-cost," passively-managed index funds that he prefers; (2) selecting what he believes were overpriced "share classes" of several investments;[9] and (3) allowing the Plan to pay "excessive" recordkeeping fees.  (Am. Compl. ¶¶ 4-5, 69, 245-81.)  Also in Counts I through III, Plaintiff recasts these same allegations to assert that Oshkosh breached its duty of loyalty under ERISA.  (*Id.*)  In Counts IV through VI, Plaintiff alleges that Oshkosh failed to adequately monitor the Plan's fiduciaries in various ways. (*Id.* ¶¶ 282-301.)  Finally, in Counts VII through IX, Plaintiff alleges that Oshkosh engaged in prohibited transactions under ERISA Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), simply by paying Fidelity and SAI for their ordinary services rendered to the Plan.  (*Id.* ¶¶ 302-19.)

On August 17, 2020, Oshkosh moved to dismiss Plaintiff's original Complaint.  (Dkt. 15, 16.)  Plaintiff responded by filing an Amended Complaint on August 31, 2010.  (Dkt. 20.)

### III.    DISCUSSION

### A.    Legal Standards Governing Motion To Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state

---

[9] Mutual funds may offer different "share classes," including "retail" share classes, where investors pay the same expenses as the public, and "institutional" share classes, which are typically for larger, institutional investors and charge slightly lower expense ratios.  *Loomis*, 658 F.3d at 670.  Retail share classes typically pay more in revenue sharing.  *See, e.g.*, *White v. Chevron Corp. ("White II")*,2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (recognizing that a plan fiduciary used retail share class funds to "pa[y] the Plan's recordkeeping expenses").

7

a claim to relief that is plausible on its face." *Hecker*, 556 F.3d at 580. To be "plausible," a plaintiff's allegations must raise "more than the mere possibility of misconduct." *Divane*, 953 F.3d at 988 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Thus, where there are "two possible explanations, only one of which can be true and only one of which results in liability, plaintiff [] cannot offer allegations that are 'merely consistent with' [its] favored explanation but are also consistent with [an] alternative explanation." *White v. Chevron Corp.*, 752 F. App'x 453, 454 (9th Cir. 2018) ("*White III*") (affirming Rule 12(b)(6) dismissal of similar fiduciary breach claims), *cert. denied*, 139 S. Ct. 2646 (2019).

In the ERISA class action context, a motion to dismiss is an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). This is because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value[.]" *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) ("*St. Vincent*"). Accordingly, the Seventh Circuit has held that, "[w]hen claiming an ERISA violation, the plaintiff must plausibly allege action that was objectively unreasonable"—*i.e.*, that "no 'hypothetical prudent fiduciary' would have made the same objective choice[s]" being challenged in the case. *Divane*, 953 F.3d at 988 (quoting in part *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016), and *Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011)).

Applied here, these principles confirm that Plaintiff fails to state any plausible claims under ERISA. To the contrary, the Amended Complaint comprises a prototypical example of the sorts

of allegations that the Seventh Circuit has repeatedly rejected as implausible and insufficient to state a claim. *See Divane*, 953 F.3d 980; *Loomis*, 658 F.3d 667; *Hecker*, 556 F.3d 575.

**B.     Seventh Circuit Precedent Forecloses Plaintiff's Claims That Oshkosh Breached Its Fiduciary Duties In Administering The Plan**

Earlier this year, the Seventh Circuit affirmed the dismissal of ERISA claims very similar to Plaintiff's claims here. *See Divane*, 953 F.3d 980. In *Divane*, a group of participants challenged multiple aspects of Northwestern University's retirement plans, asserting that the plan fiduciaries violated ERISA by offering investment options that were "too expensive" and by "permitting excessive fees" for recordkeeping. *Id.* at 985, 991. Like Plaintiff's Amended Complaint here, the operative complaint in *Divane* alleged that: (a) the plans should have offered passively-managed index funds instead of actively-managed funds; (b) the plans' investment options were too expensive; (c) the plans should have invested in lower-cost share classes; and (d) the plans paid too much in recordkeeping fees. *See Divane v. Nw. Univ.*, No. 18-cv-2569, Dkt. 38, Am. Compl. (Dec. 15, 2016). Despite the plaintiffs' "massive" complaint spanning "287 paragraphs over 141 pages," *Divane*, 953 F.3d at 983, the Seventh Circuit built upon its prior holdings in *Loomis* and *Hecker* to hold that their allegations did not describe fiduciary behavior that was "objectively unreasonable," but were at least equally plausible with "rational decision[s] for a business to make … when implementing an employee benefits program," *id.* at 988-89.

First, the court reaffirmed that "plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty." *Id.* at 992 (citing *Loomis*, 658 F.3d at 673-74; *Hecker*, 556 F.3d at 586). Thus, despite the plaintiffs' "clear preference" for low-cost funds, those preferences did not render the plan's offering of other alternatives (including actively-managed funds) imprudent, especially where the plan made at least some "low-cost index funds … available." *Id.* at 989, 991. Second, as to the plan's recordkeeping fees, the court reaffirmed

9

that there is nothing wrong with a revenue-sharing fee structure, and concluded that the amount of the Northwestern plans' fees—alleged to have ranged from $153 to $213 annually per participant over the relevant period—were not indicative of imprudence even though the plaintiffs alleged that a reasonable fee would be $35 per person. *Id.* at 984, 989-91. Third, the court held that the offering of higher-cost share classes of investments did not give rise to any fiduciary breach because an investment's cost is not itself an indicator of imprudence. *Id.* at 991-92.

> Ultimately, the Seventh Circuit summed up its analysis as follows:
>
> Construing the facts and allegations in plaintiffs' favor, the amended complaint fails to plausibly allege a breach of fiduciary duty under ERISA. Taken as a whole, the amended complaint appears to reflect plaintiffs' own opinions on ERISA and the investment strategy they believe is appropriate for people without specialized knowledge in stocks or mutual funds. Ultimately, defendants "cannot be faulted for" leaving "choice to the people who have the most interest in the outcome."

*Id.* at 993 (quoting *Loomis*, 658 F.3d at 673-74); *see also id.* at 989 ("[I]t would be beyond the court's role to seize ERISA for the purpose of guaranteeing individual litigants their own preferred investment options."). More recently, another district court in this circuit described *Divane* as "one in a line of Seventh Circuit cases preventing courts from paternalistically interfering with [p]lans' slates of funds[.]" *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *3-4 (N.D. Ill. July 1, 2020) (dismissing virtually identical claims to those alleged here under Rule 12(b)(6): "Plaintiff cannot proceed on its allegations that revenue sharing was too high, only institutional class funds should be on offer, and the Plan should offer … index funds.").[10]

As explained in the sections that follow, this Court should reach the same result and dismiss Plaintiff's claims as foreclosed by *Divane* and other controlling Seventh Circuit precedent.

---

[10] The *Martin* plaintiffs asserted that the fiduciaries breached their duties because the plan allegedly: (1) "paid too much for … recordkeeping," including through the use of "revenue sharing"; (2) should have used lower-cost share classes for "more than 40% of the funds" offered by the plan; and (3) should have offered lower-cost "passively managed" investments, not "more expensive, actively managed" funds. *See Martin*, 2020 WL 3578022, at *1-2, 4 ("*Divane* resolves most of this case.").

### 1. Plaintiff's Preference For Low-Cost And Passively-Managed Investments Fails To Plausibly Demonstrate Imprudence

Plaintiff says that Oshkosh's fiduciary process must be imprudent because the Plan's investment menu included "actively managed" investments, instead of restricting participant choice to various "passively managed" index funds that Plaintiff prefers because they are "lower-cost." (Am. Compl. ¶ 190; *see id.* ¶¶ 172-96.) For several reasons, this theory is without merit.

First, the Seventh Circuit in *Divane* rejected this exact claim, reaffirming that a fiduciary does not act imprudently by offering participants a choice to invest in actively-managed funds, and that ERISA does not require a fiduciary to limit a retirement plan's investment menu to only low-cost, passively managed index funds. *See Divane*, 953 F.3d at 989 ("That plaintiffs prefer low-cost index funds to the [actively-managed] Stock Account does not make its inclusion in the plans a fiduciary breach."). Rather, the Court of Appeals has repeatedly emphasized that what matters is that a plan "offer[s] a … mix of investments," *Hecker*, 556 F.3d at 586, that span a "range of options" at different levels of cost, *Loomis*, 658 F.3d at 670.

The Plan's investment menu did just that. Throughout the relevant period, the Plan has offered approximately two dozen different investment options across various asset types and at different levels of cost, with expense ratios spanning from 0.035% to 1.08%. (*See* Exs. 6-11, 404a-5 Disclosures.) This "mix of investments" falls comfortably within the range that the Seventh Circuit has recognized as prudent. *See Divane*, 2018 WL 2388118, at *3 (ranging from 0.05% to 1.89%), *aff'd*, 952 F.3d 980; *Loomis*, 658 F.3d at 669 (ranging from 0.03% to 0.96%); *Hecker*, 556 F.3d at 586 (ranging from 0.07% to "just over 1%").[11]

---

[11] Indeed, the Plan's range of expense ratios is almost identical to the range that the *Martin* court recently held to be reasonable under *Divane*, *Loomis*, and *Hecker*. *See* 2020 WL 3578022, at *6 (holding that expense ratios from 0.04% to 1.06% reflected "an acceptable mix of options").

<u>Second</u>, Plaintiff's myopic focus on cost ignores that "[f]iduciaries have latitude to value investment features other than price (and, indeed, are required to do so)." *White v. Chevron Corp. ("White I")*, 2016 WL 4502808, at *10 (N.D. Cal. Aug. 29, 2016). As the Seventh Circuit put it, "nothing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586; *accord Loomis*, 658 F.3d at 670 ("The fact that … some other funds might have had even lower ratios is beside the point."). Yet Plaintiff's only criticism of the Plan's investment choices is that, in his view, many of the options cost too much versus cheaper funds in the market. This is not enough to state a claim.

<u>Third</u>, to the extent Plaintiff prefers low-cost index funds, the Plan made that option available to him. At all times during the relevant period, the Plan offered such a fund: the Vanguard Institutional Index Fund, with an expense ratio of 0.04% or less. (*See* Exs. 6-11, 404a-5 Discls.) The fact that Oshkosh opted to diversify the Plan's investment menu by also offering different types of investment choices for participants with different investment preferences than Plaintiff does not reflect imprudence. *See Divane*, 953 F.3d at 991 ("[T]he types of funds plaintiffs wanted (low-cost index funds) were and are available to them, eliminating any claim that plan participants were forced to stomach an unappetizing menu."); *see also Loomis*, 658 F.3d at 671 ("Any participant who wants a fund with expenses under 0.1% can get it through [the] plan."); *Martin*, 2020 WL 3578022, at *6 ("Defendants' failure to offer every index fund under the sun is not, in and of itself, imprudent."). Were it otherwise, the complaints in *Divane*, *Loomis*, and *Hecker* would all have stated a claim because those complaints had the same allegations; indeed, every employer that elected to offer a retirement plan would be susceptible to multi-million-dollar class-action lawsuits because there will always be some cheaper or better-performing fund that can

12

be identified from the thousands available in the market.[12]  But of course that is not the law, and the Court should reject Plaintiff's invitation to depart from Seventh Circuit precedent.

In short, Plaintiff's allegations confirm only that Oshkosh "offered participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense index funds that track the market," and "left choice to the people who have the most interest in the outcome." *Loomis*, 658 F.3d at 673-74.  Oshkosh "cannot be faulted for doing this." *Id.*[13]

## 2. Plaintiff's Criticism About The Share Classes Of Certain Investments Fails To Plausibly Demonstrate Imprudence

Plaintiff also asserts that Oshkosh breached its fiduciary duties by selecting inappropriate "share classes" for some of the Plan's investments.  (Am. Compl. ¶¶ 128-68.)  More specifically, Plaintiff now alleges—in direct contradiction of his original claim—that it was *per se* imprudent for Oshkosh to offer anything other than "lowest net fee" share class (*id*. ¶ 130-31), even if the expense ratio the participant pays for that share class is not the "lowest cost."  This claim fails.

As a starting point, the Court cannot ignore Plaintiff's total about-face in challenging the Plan's share-class offerings, which itself is enough to confirm that Oshkosh's decisions cannot be deemed "objectively unreasonable" under either scenario.  *See Divane*, 953 F.3d at 988 (reiterating that ERISA claims are implausible unless a plaintiff's allegations can plausibly show that "no hypothetical prudent fiduciary would have made the same objective choice").

In his original Complaint, Plaintiff alleged that Oshkosh breached its fiduciary duty by not selecting share classes with the cheapest expense ratios.  (Compl. ¶¶ 76-84.)  And he specifically alleged that it was not "an excuse to select higher cost versions of the same fund to pay for Plan

---

[12] Even where plan fiduciaries offer a fund that a plaintiff prefers (like the low-cost Vanguard index fund here), the plan will invariably also offer *other* funds that are more expensive or may not perform as well.

[13] Plaintiff's original Complaint also alleged that Oshkosh breached its fiduciary duties by choosing not to offer certain investments as collective investment trusts ("CITs"), rather than mutual funds.  (*See* Compl. ¶¶ 57-67.)  After Oshkosh's initial motion to dismiss, the Amended Complaint abandons that theory.

expenses." (*Id.* ¶ 83.) Now, Plaintiff's Amended Complaint asserts exactly the opposite. He asserts that Oshkosh was imprudent in offering some of the very same "lower share classes" that he previously alleged were prudent because, in his view, the higher-cost share classes allocate a greater portion of their expense ratios to revenue sharing to pay for the Plan's recordkeeping expenses, and thus arguably result in lower net investment-management expenses for participants. (Am. Compl. ¶¶ 131-36.) As a specific example, Plaintiff previously alleged that Oshkosh breached its fiduciary duties because the Plan should have offered the ClearBridge Small Group Growth Fund in "Class IS," and he now alleges that Oshkosh breached its fiduciary duties because the Plan should *not* have offered the ClearBridge Small Group Growth Fund in "Class IS." (*Compare* Compl. ¶¶ 78, 80, *with* Am. Compl. ¶ 136.) It is hard to think of a more concrete example of a damned-if-you-do-damned-if-you-don't predicament for ERISA fiduciaries than being sued by the same Plaintiff's lawyers—in the same lawsuit—alleging that both sides of the same decision were fiduciary breaches. The Seventh Circuit has instructed that ERISA fiduciaries must not be seated "on a razor's edge." *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 987 (7th Cir. 2013). But that is precisely the precarious position where Plaintiff's dueling claims would seat Oshkosh here. How can it possibly have been imprudent for Oshkosh to both offer—and not offer—the same investment(s) during the same time period?

In reality, the Seventh Circuit has recognized that fiduciaries can appropriately—and prudently—choose from several approaches in selecting investment share classes. In *Divane*, the plaintiffs specifically alleged that the fiduciaries were imprudent by failing to utilize lower-cost share classes in more than 100 different investment options. *See Divane v. Nw. Univ.*, No. 16-cv-8157, Dkt. 38, Am. Compl. ¶ 161 (N.D. Ill. Dec. 15, 2016). The Court of Appeals held that such allegations did not (alone or in combination with the other allegations) give rise to a claim,

14

reaffirming that investment cost alone—even as to share-class selections—cannot create an inference of imprudence. *See Divane*, 953 F.3d at 991 (rejecting allegations that some investments "were retail funds with retail[] fees," "had unnecessary layers of fees," or "could have been cheaper" for participants); *see also Loomis*, 658 F.3d at 670 (disagreeing that fiduciaries breached any duty "by offering 'retail' mutual funds" instead of "'institutional' investment" classes).[14] What matters is that fiduciaries offer a "wide range of investment options and fees," and that holds true here. *Divane*, 953 F.3d at 992 (citing *Loomis*, 658 F.3d at 673-74; *Hecker*, 556 F.3d at 586).

This precedent alone is fatal to Plaintiff's share-class claim. And there are good reasons why the Seventh Circuit has consistently rejected these types of theories, as evidenced by the allegations here. Sticking with the ClearBridge Fund as an example, Plaintiff contends that the "Class A" investment was the only prudent option because even though its total cost (1.20%) is greater than the "Class IS" option (0.78%), the "Class A" option credits more of its expense ratio to revenue sharing (0.50%), such that participants allegedly pay less in net investment management fees (0.70% vs. 0.78%). (*See* Am. Compl. ¶ 136.) There are several flaws with this reasoning.

First, the Seventh Circuit has held that "[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment." *Hecker*, 556 F.3d at 586. This precedent precludes Plaintiff's attempt to parse the total expense ratio in trying to state a claim.[15]

---

[14] Other courts have agreed with this rationale. *See, e.g.*, *Martin*, 2020 WL 3578022, at *4 ("*Divane* clarified that a fund's failure to invest in institutional as opposed to retail funds does not give rise to an inference of imprudence when a plan offers cheaper alternatives."); *White II*, 2017 WL 2352137, at *14 ("[A]mple authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach."); *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017) ("[I]nclusion of retail options does not, on its own, suggest imprudence.").

[15] For this same reason, Plaintiff is wrong in asserting that the Plan's fee disclosures and his quarterly participant account statements were impermissibly "ambiguous" because they did not specify revenue-sharing formulas for each investment, among other information. (Am. Compl. ¶¶ 221-32.) The Seventh Circuit has specifically rejected the notion that a plan must disclose formulas and related "information about

Second, Plaintiff overlooks that the "Class A" shares of the ClearBridge Fund carry a front-end sales charge of up to 5.75%, whereas the "Class IS" shares do not.[16]  In this way, a participant's potential incremental savings in investment management fees (0.08%, or 80 cents for every $1,000 invested) would almost certainly be swallowed up by the substantial front-end sales charge (5.75%, or $57.50 for every $1,000 invested) required to obtain the "Class A" share option at the outset.

Finally, the revenue-credit rationale on which Plaintiff's theory rests (*see* Am. Compl. ¶ 131) is not as simple as he suggests.  By design, the revenue-sharing component of an investment goes to pay recordkeeping fees; while *some portion* might be rebated back to participants through a revenue credit at the end of the year, participants certainly do not always get that entire percentage back.  Taking the ClearBridge Fund, for instance, if only a fifth of the 0.50% revenue sharing payment (0.10%) went to pay recordkeeping expenses, then the "Class A" shares would not have resulted in lower net fees than the "Class IS" shares, even under Plaintiff's logic.  Moreover, the timing of those potential rebates is itself a consideration the Amended Complaint ignores.  Plaintiff does not and cannot allege that it is always better to pay 1.20% in fees now (the "Class A" shares) and have some portion of 0.50% rebated back at the end of year, instead of paying only 0.78% in fees (the "Class IS" shares) and having the extra money invested throughout the whole year.  This is not to say that one approach is better or more prudent than the other, but

---

the revenue-sharing arrangement," because it is the "total fee" that is the "critical figure" for disclosure. *Hecker*, 556 F.3d at 586.  Otherwise, the disclosures appropriately characterized the nature of services being provided in exchange for the administrative fees—*i.e.*, to include "recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan."  (*See, e.g.*, Exs. 10-11, 2018–19 404a-5 Discls. at 4.)  Finally, insofar as Plaintiff is alleging that his quarterly account statements must better describe the nature of the "services … provided" (Am. Compl. ¶ 223), the DOL does not require that sort of detail.  *See* 75 Fed. Reg. 64,910, 64,914 n.8 (Oct. 20, 2010) (explaining that "administrative charges do not need to be broken out into service-by-service detail on the quarterly statement").

[16]  *See*  https://www.leggmason.com/content/dam/legg-mason/documents/en/product-literature/fact-sheet/fact-sheet-cbi-small-cap-growth.pdf ("Class A shares have a maximum front-end sales charge of 5.75%.") (last visited Oct. 5, 2020).

it does demonstrate why the Seventh Circuit has concluded that neither approach is "objectively unreasonable" or actionable as a fiduciary breach under ERISA.

As in *Divane*, *Loomis*, and *Hecker*, Plaintiff's preferences for different share classes of certain investments are not enough to state a plausible claim for breach of fiduciary duty.

### 3. Plaintiff's Dissatisfaction With The Plan's Recordkeeping Fees Fails To Plausibly Demonstrate Imprudence

Plaintiff separately alleges that the Plan's recordkeeping costs were "unreasonable" and "excessive," including because he would prefer that the Plan assess those costs as a fixed charge for each participant on a pro-rata basis with no revenue sharing. (Am. Compl. ¶¶ 88-114.) Controlling precedent dictates that these sort of criticisms regarding the structure and amount of the Plan's fees are insufficient to state a claim for breach of fiduciary duty.

<u>First</u>, starting with structure, the Seventh Circuit has consistently held that recordkeeping fees "need not be individually allocated or based on any specific fee structure," and that "revenue sharing" is perfectly lawful. *Divane*, 953 F.3d at 989-90 ("There is … nothing wrong—for ERISA purposes—with plan participants paying recordkeeper costs through expense ratios."); *Loomis*, 658 F.3d at 672-73 (affirming dismissal of claims challenging use of asset-based revenue sharing to pay recordkeeping fees); *Hecker*, 556 F.3d at 585 (same). After all, "[a] flat-fee structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a capitation fee could work out to more, per dollar under management[.]" *Loomis*, 658 F.3d at 672; *accord Divane*, 953 F.3d at 989 (recognizing that a "revenue-sharing structure" can be just as reasonable as a "pro-rata fee.").[17] Accordingly, insofar

---

[17] In this way, the Seventh Circuit has recognized that a revenue-sharing model can actually empower participants to minimize their individual plan costs, if that is a priority for their personal approach to retirement investing. *See Divane*, 953 F.3d at 991 n.10 ("[P]lan participants had options to keep the expense ratios (and, therefore, recordkeeping expenses) low. The amount of fees paid were within the participants' control because they could choose which funds to invest the money in their account.").

17

as Plaintiff is faulting the Plan for using an asset-based, revenue-sharing model for recordkeeping fees, instead of a fixed rate or pro-rata allocation among participants, his claim fails.

Second, Plaintiff's allegations concerning the amount of the Plan's recordkeeping fees similarly fail to show any plausible fiduciary breach. Setting aside conclusory buzzwords like "excessive" and "unreasonable" (*see* Am. Compl. ¶¶ 69, 108, 113), Plaintiff's allegations boil down to the assertion that the Plan's participants paid an average of $87 in annual recordkeeping fees over the proposed class period—allegedly ranging from as low as $67 annually in 2017, up to $113 annually in 2016—which he says was too much. (*Id.* ¶ 100.)

Plaintiff fails to explain the methodology behind his (flawed) calculations, but even accepting his amounts as true for Rule 12(b)(6) purposes, they do not support an inference of imprudence. After all, those fees are decidedly beneath even *the low end* of the range that the Seventh Circuit held to be reasonable in *Divane* ($153 to $213 annually). *See Divane*, 953 F.3d at 984, 991 ("Plaintiffs have identified no alternative recordkeeper that would have accepted such a low fee or any fee lower than what was paid to Fidelity and TIAA."); *see also Martin*, 2020 WL 3578022, at *4 (applying *Divane* to conclude that plan's recordkeeping fees, ranging from about $130 to about $220 per person, "were not inconsistent with prudent portfolio management"). Naturally, then, Plaintiff's conclusory assertions insisting that the Plan's fees were nevertheless "excessive" cannot state a plausible claim for relief. *See Iqbal*, 556 U.S. at 678; *Divane*, 953 F.3d at 987 ("[W]e need not accept as true … unsupported conclusory factual allegations.").[18]

---

[18] Plaintiff points to Oshkosh's "substantial bargaining power" associated with the Plan's $1.1 billion in assets to argue that it should have negotiated lower recordkeeping fees (Am. Compl. ¶ 27.) Notably, one of the Northwestern plans at issue in *Divane* was nearly twice the size of the Plan here—alleged to have "$2.34 billion" in retirement assets and "21,622 participants." *Divane*, 953 F.3d at 984 n.6. By Plaintiff's logic, that plan would have nearly twice the "bargaining power" as the Plan here, and yet the Seventh Circuit blessed as reasonable that plan's annual recordkeeping fees of between $153 and $213. *Id.* at 985 (holding that fiduciaries were not required to "find a record-keeper willing to take $35/participant/year").

Third, further scrutiny of Plaintiff's recordkeeping-fee allegations confirms that his claim fails as a matter of law. The Amended Complaint includes a few charts and graphs that purport to compare the Plan's average fees against those of "similar" plans, which Plaintiff uses to say that the Plan should have paid no more than $40 annually per participant. (Am. Compl. ¶¶ 100-02, 106.) Plaintiff's charts show nothing of the sort because he is comparing apples and oranges. For the so-called "similar" plans, the amount listed in Plaintiff's "RK&A Price" column is only the "direct compensation" disclosed on the Forms 5500, even though the same forms show that the recordkeepers also received indirect compensation (*i.e.*, revenue sharing). (*See* Am. Compl. ¶ 101 n.1.)[19] For the Oshkosh Plan, however, Plaintiff uses a different methodology. He does not list the "direct compensation" the Plan paid to Fidelity in 2018; that amount was $164,010. (*See* Ex. 5, 2018 Form 5500, Sch. C.) Instead, Plaintiff more than quintuples the "direct compensation" paid to Fidelity in 2018, stating the Plan's "RK&A Price" as $1,004,305. In other words, Plaintiff seems to be comparing what he alleges to be the total compensation (direct *and* indirect) paid by the Oskhosh Plan against just the direct compensation paid by his so-called "similar" plans, even though the other plans also paid the same sort of indirect compensation the Plan here paid.[20] This

---

[19] *See* Ex. 12, 2018 Form 5500 for Republic National 401(K) Plan, Sch. C (disclosing $324,171 in "direct compensation" to Great-West, but also an unspecified amount of "indirect compensation"); Ex. 13, Form 5500 for Southern California Permanente Medical Group Tax Savings Retirement Plan, Sch. C (disclosing $333,038 in "direct compensation" to Vanguard, but also "indirect compensation"); Ex. 14, Form 5500 for Sutter Health Retirement Income Plan, Sch. C (disclosing $460,727 in "direct compensation" to Fidelity, but also "indirect compensation"); Ex. 15, 2018 Form 5500 for The Tax Sheltered Annuity Plan of Texas Children's Hospital, Sch. C (disclosing $416,395 in "direct compensation" to Fidelity, but also "indirect compensation"); Ex. 16, DHL Retirement Savings Plan, Sch. C (disclosing $483,191 in "direct compensation" to Fidelity, but also "indirect compensation").

[20] Plaintiff inflates this number even further by comparing the Plan's "average" fee over the proposed class period from 2014 to 2018 against data from the "similar" plans from 2018 only. (*See* Am. Compl. ¶¶ 100-01.) Even his own methodology says that the Plan's "RK&A Fees" for 2018 were "$986,351," which divided among 12,623 participants would yield a per participant number of $78. (*See id.* ¶ 100.) Of course, for the reasons explained, it would still be inappropriate to compare that figure against the others in the charts, but this provides another example of why Plaintiff's allegations are distorted and useless.

19

kind of apples-to-oranges comparison is meaningless. Using the same methodology to identify the Plan's fees that Plaintiff uses for the "similar" plans—*i.e.*, comparing apples to apples by dividing "direct compensation" by the total participants—it would yield an annual recordkeeping fee of only $13 per participant ($164,010 ÷ 12,623 participants = $12.99). That hardly qualifies as an "excessive" or "unreasonable" fee when compared to the other amounts Plaintiff identifies.

In short, not only are Plaintiff's recordkeeping-fee allegations facially implausible under Seventh Circuit precedent, but they also rest on flawed comparisons and inaccuracies. As the Court of Appeals has held, Plaintiff cannot state a plausible claim of breach of fiduciary duty under ERISA simply by "propos[ing] alternative recordkeeping arrangements [he] would have preferred," particularly based on such faulty assertions. *Divane*, 953 F.3d at 989. Because that is all he has done, his recordkeeping-fee claims must be dismissed.

### 4. Plaintiff's Dissatisfaction With The Fees Paid To The Plan's Investment Advisor Fails To Plausibly Demonstrate Imprudence

Plaintiff separately criticizes the fees paid to the Plan's investment advisor, SAI, as "excessive and unreasonable." (Am. Compl. ¶ 214.) These allegations are just as conclusory as Plaintiff's recordkeeping-fee allegations, and just as implausible. Other than listing SAI's annual fees over the proposed class period, and then baldly labeling those fees "excessive," Plaintiff offers no factual allegations to support his claim. His *ipse dixit* that there are "equally or superior services available" at "lower rates" or "for free" (*see id.* ¶ 215) certainly does not make it plausible that Oshkosh breached any fiduciary duty by paying SAI for its services to the Plan, especially when he does not offer any allegations concerning how the level of SAI's services to the Plan would ostensibly compare to some theoretical lower-cost alternative. These are the same type of allegations that the Seventh Circuit has rejected with respect to plan recordkeeper fees, as described above. The fact that SAI's services may be different from those provided by a

20

recordkeeper does not change the legal analysis. After all, if Plaintiff's threadbare allegations could state a claim, then every 401(k) plan that partnered with an investment advisor would be susceptible to a claim of fiduciary breach, which runs counter to the Seventh Circuit's guidance that *encourages* the use of outside investment experts. *See, e.g.*, *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998) ("Seeking independent expert advice is evidence of a thorough investigation[.]"). This is not the law, of course, and Plaintiff's claim should be dismissed.[21]

### C. Plaintiff's Bootstrapped Disloyalty Claims Are Not Plausible

In Counts I through III, Plaintiff separately asserts that Oshkosh breached ERISA's duty of loyalty, which requires fiduciaries to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A); *see also Chesemore v. Alliance Holdings Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012) (holding that a breach of the duty of loyalty occurs when a fiduciary has "substantial conflicts of interest" and does not act "with an eye single to the interests of the participants and beneficiaries"), *aff'd sub nom. Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016). But in pressing these claims, Plaintiff just repackages the same allegations that underpin his claims for breach of the duty of prudence. (Am. Comp. ¶¶ 70, 246-81.) Courts routinely reject this sort of bootstrapping, as Oshkosh explained in its prior motion to dismiss. (*See* Dkt. 16 § III.C.) Yet Plaintiff doubled down on that same approach in his Amended Complaint, setting forth zero independent allegations that Oshkosh was somehow disloyal to the

---

[21] To the extent that Plaintiff is suggesting there is something wrong with the Plan offering Fidelity-managed investments since SAI was allegedly "Fidelity's subsidiary" (*see* Am. Compl. ¶¶ 212-13), the Seventh Circuit has squarely rejected that theory. *See Hecker*, 556 F.3d at 586 (rejecting any inference of imprudence from allegations that fiduciary "improperly limited the investment options to Fidelity mutual funds," where Fidelity was a plan service provider). If those allegations failed to support an ERISA claim in *Hecker*, where the plan's offerings comprised exclusively Fidelity products (along with a brokerage window), then Plaintiff's claims are even weaker here, where the Plan's investment menu also included many offerings that were unaffiliated with Fidelity, including from well-known investment managers such as John Hancock, Morgan Stanley, T. Rowe Price, and Vanguard. (*See, e.g.*, Ex. 11, 2019 404a-5 Discl.)

21

Plan's participants. Plaintiff fails to state any plausible claims of disloyalty. *See, e.g.*, *Loomis*, 658 F.3d at 671 (affirming dismissal of disloyalty claim where complaint did not separately allege facts to show that defendant selected investments "to enrich itself at participants' expense"); *Martin*, 2020 WL 3578022, at *6 (dismissing "duty of loyalty claim based on the same facts as the duty of prudence claim," as "most courts require something more … to survive a motion to dismiss"); *Sacerdote*, 2017 WL 3701482, at *5 ("[A] plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts[.]").

### D. Plaintiff Fails To State A Plausible Failure-To-Monitor Claim

Through Counts IV through VI, Plaintiff alleges that Oshkosh breached a duty to monitor other plan fiduciaries. (Compl. ¶¶ 132-38.) These claims fail because they are wholly derivative causes of action that collapse with Plaintiff's principal claims for fiduciary breach. *See, e.g.*, *Howell v. Motorola, Inc*., 633 F.3d 552, 563 (7th Cir. 2011); *Rogers v. Baxter Int'l Inc*., 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) ("Without an underlying breach of fiduciary duty, [plaintiff's] claim for failure to monitor fails on its merits.").

### E. Plaintiff Fails To State Plausible Prohibited-Transaction Claims

In Counts VII through IX, Plaintiff alleges that Oshkosh engaged in prohibited transactions under ERISA Section 406(a)(1) by paying negotiated fees to Fidelity and SAI for their services to the Plan. (Am. Compl. ¶¶ 302-19; *see also id.* ¶¶ 218-20.) This theory fails as a matter of law.

Section 406(a)(1) of ERISA prohibits, among other transactions, the "furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). This provision, and the rest of ERISA's prohibited-transaction rules, were designed to "supplement[] the fiduciary's general duty of loyalty … by categorically barring certain transactions deemed likely to injure the pension plan." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000); *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996) (explaining that

22

Section 406 of ERISA prohibits "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length").

Here, Oshkosh recognizes that Fidelity and SAI are "parties in interest" under ERISA because they provide (or, at least at some point, provided) services to the Plan. *See* 29 U.S.C. § 1002(14)(B). In fact, all service providers to a plan are "parties in interest." *Id.* But Plaintiff's theory stretches the statute too far by attempting to penalize Oshkosh simply for paying Fidelity and SAI for the same services that rendered them parties in interest to the Plan in the first place. Courts routinely dismiss prohibited-transaction claims premised on this same "circular reasoning"—*i.e.*, that "transactions were prohibited because [the service provider] was a party in interest, and [the service provider] was a party in interest because it engaged in the prohibited transaction." *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018); *see also, e.g.*, *Ramos v. Banner Health*, -- F. Supp. 3d --, 2020 WL 2553705, at *54 (D. Colo. May 20, 2020) (agreeing that Section 406 "does not prohibit a plan from paying an unrelated party, dealt with at arm's length, for services rendered"); *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *12 (C.D. Cal. Aug. 14, 2019) ("Plaintiff's contention that Defendants engaged in a prohibited transaction by paying a party in interest … for services rendered to the Plan is unpersuasive."); *Sacerdote*, 2017 WL 3701482, at *14 (warning that a contrary result "would transform § 406 … into a statutory provision that proscribes [a] retirement pension plan's most basic operations").[22]

As those courts rightly recognized, these types of transactions—*i.e.*, paying ordinary recordkeepers and investment advisors for services negotiated at arm's length—are not the sort of deals "struck with plan insiders" that ERISA aims to prohibit. *Sellers*, 316 F. Supp. 3d at 36 (citing

---

[22] This holds true even where a plaintiff alleges that a plan "paid too much for [the] services." *Sacerdote*, 2017 WL 3701482, at *14; *see also Patrico v. Voya Fin., Inc.*, 2018 WL 1319028, at *6-7 (S.D.N.Y. Mar. 13, 2018); *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *10 (S.D.N.Y. Sept. 29, 2017).

23

*Lockheed*, 517 U.S. at 893); *cf. Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 125-26 (3d Cir. 2013) ("Negotiation between … unaffiliated parties does not fall into the category of transactions that Section 406(a) was meant to prevent."). If anything, Plaintiff's theory would hurt plans and plan participants by "discourag[ing] service providers from contracting with [plans] in the first place." *Sellers*, 316 F. Supp. 3d at 36; *see also Sacerdote*, 2017 WL 3701482, at *14.

Because Plaintiff's prohibited-transaction allegations rest on nothing but a circular theory attacking routine service-provider relationships, the Amended Complaint fails to state a plausible claim that Oshkosh engaged in any prohibited transactions under ERISA.

### F.    <u>Plaintiff Lacks Standing To Challenge Investments He Never Selected</u>

Finally, even if some aspect of Plaintiff's Amended Complaint stated a plausible claim to relief under ERISA (it does not), he still fails to establish the jurisdictional prerequisite of Article III standing to pursue claims concerning many of the investment options offered by the Plan.

The "irreducible constitutional minimum of standing consists of three elements": a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The injury-in-fact element requires a showing that the plaintiff "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citations omitted). "[A]t the pleading stage," a plaintiff "must clearly … allege facts demonstrating each element" of standing. *Id.* at 1547. This burden applies to "each claim" and "each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008); *see also Dezelan v. Voya Ret. Ins. & Annuity Co.*, 2017 WL 2909714, at *5 (D. Conn. July 6, 2017) (holding that an ERISA plaintiff asserting fiduciary breach claims "must demonstrate standing for each claim" and "with respect to each asserted claim … a plaintiff must always have suffered a distinct and palpable injury to herself").

24

Earlier this year, the Supreme Court resolved a circuit split concerning constitutional standing in fiduciary-breach claims under ERISA, reaffirming that ERISA plaintiffs possess Article III standing only to the extent they seek redress for injuries that they personally experienced, not generalized injuries to a plan in which they participated. *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619-20 (2020). Specifically, the Court made clear that "[t]here is no ERISA exception to Article III," *id.* at 1622, holding that defined-benefit plan participants lacked standing to pursue claims for breach of fiduciary duty because they had not suffered any injury in fact (*i.e.*, losses) resulting from the defendants' alleged mismanagement of the plan's assets, *id.* at 1619 ("If [plaintiffs] were to lose this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less. If [plaintiffs] were to win this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more. The plaintiffs therefore have no concrete stake in this lawsuit.").

This case presents a similar situation. Plaintiff's Amended Complaint (still) fails to allege that he invested in *any* specific investment option offered in the Plan, or paid *any* of the allegedly excessive fees associated with any specific investment option—even after Oshkosh identified this pleading shortcoming in its prior motion to dismiss (*see* Dkt. 16 § III.F). Neither does the Amended Complaint allege how much he personally paid in recordkeeping fees. Plaintiff simply alleges in general terms that he "participated in the Plan." (Am. Compl. ¶ 14.) The facts show that, since he began participating in the Plan, Plaintiff has never invested any of his personal retirement assets in 9 out of the Plan's 22 investment offerings. (*See* Decl. of Samantha Schmidt ("Schmidt Decl.") ¶¶ 2-5.)[23] Just as in *Thole*, then, Plaintiff has no "concrete stake" in any claims

---

[23] Because the question of Article III standing goes to the Court's jurisdiction, it can properly consider "evidentiary materials addressed to the jurisdictional question … at the dismissal stage." *United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996). Here, the evidence shows that the specific investment options Plaintiff never selected are as follows: (1) Fidelity Balanced Fund; (2) Fidelity

challenging the fees associated with those 9 investments, and thus no Article III standing: If he were to *lose* this lawsuit regarding those 9 investments, his account balance would be exactly the same, and if he were to *win* the lawsuit regarding those 9 investments, his account balance would still be exactly the same and he would recover nothing. 140 S. Ct. at 1619.

Applying this reasoning, courts routinely dismiss similar fiduciary-breach claims (or substantial parts of such claims) for lack of Article III standing. *See, e.g.*, *Patterson*, 2019 WL 4934834, at *5 (holding that plaintiff only had standing to pursue claims as to the 6 investment options in a 401(k) plan that he selected, but not as to the 7 other investments he never personally held); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *9-10 (D.D.C. Jan. 8, 2019) (similar); *Johnson v. Delta Air Lines, Inc.*, 2017 WL 10378320, at *2 (N.D. Ga. Dec. 12, 2017) (similar); *Dezelan*, 2017 WL 2909714, at *6 (similar); *Marshall v. Northrop Grumman Corp.*, 2017 WL 2930839, at *8 (C.D. Cal. Jan. 30, 2017) (similar); *David v. Alphin*, 817 F. Supp. 2d 764, 781-82 (W.D.N.C. 2011) (similar), *aff'd*, 704 F.3d 327 (4th Cir. 2013); *Yost v. First Horizon Nat'l Corp.*, 2011 WL 2182262, at *6 (W.D. Tenn. June 3, 2011) (similar). The same result should follow here.

Accordingly, the Court must at least dismiss for lack of Article III standing those aspects of Plaintiff's claims premised on the 9 investments he never selected from the Plan.

## IV. **CONCLUSION**

In response to Oshkosh's initial motion to dismiss, Plaintiff filed an Amended Complaint, ostensibly to try to address the deficiencies in his original pleading. It is now clear that he cannot do so, and the Amended Complaint fails as a matter of law. Accordingly, and for the reasons

---

Freedom 2010 Fund; (3) Fidelity Freedom 2020 Fund; (4) Fidelity Freedom 2030 Fund; (5) Fidelity Freedom 2040 Fund; (6) Fidelity Freedom 2060 Fund; (7) Fidelity Freedom Income Fund; (8) Fidelity Managed Income Portfolio II; and (9) Fidelity Government Cash Reserves. (Schmidt Decl. ¶ 5.)

explained above, Oshkosh respectfully requests that the Court apply settled Seventh Circuit precedent to dismiss Plaintiff's claims—and this action—in full and with prejudice.

Dated:  October 5, 2020

_s/ Deborah S. Davidson_

Deborah S. Davidson
Morgan, Lewis & Bockius LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: 312.324.1159
Fax: 312.324.1001
deborah.davidson@morganlewis.com

Bernard J. Bobber
Kevin J. Kinney
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1243 North 10th Street, Suite 200
Milwaukee, WI 53205
Telephone: 414.239.6300
Fax: 414.755.8289
bernard.bobber@ogletree.com
kevin.kinney@ogletree.com

Jeremy P. Blumenfeld
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: 215.963.5258
Fax: 215.963.5001
jeremy.blumenfeld@morganlewis.com

Mark E. Schmidtke
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
56 S. Washington Street, Suite 302
Valparaiso, IN 46383
Telephone: 219.242.8668
Fax: 219.242.8669
mark.schmidtke@ogletree.com

Matthew J. Sharbaugh
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  202.739.5623
Fax:  202.739.3001
matthew.sharbaugh@morganlewis.com

_Attorneys for Defendants_

DB1/ 116407632

27