# EXHIBIT 1

**2020 WL 7062395**
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Richard A. Kong, et al.

v.

Trader Joe's Company, et al.

Case No. CV 20-05790 PA (JEMx)
|
Filed 11/30/2020

**Attorneys and Law Firms**

G. Garcia, Deputy Clerk, Attorneys Present for Plaintiffs:
None

Not Reported, Court Reporter, N/A, Tape No., Attorneys
Present for Defendants: None

**Proceedings:** IN CHAMBERS – COURT ORDER

The Honorable PERCY ANDERSON, UNITED STATES
DISTRICT JUDGE

 **\*1** Before the Court is a Motion to Dismiss filed by
defendants Trader Joe's Company ("Trader Joe's), The
Board of Directors of Trader Joe's Company (the "Board")
and The Investment Committee (the "Committee") (jointly
"Defendants"). (Dkt. No. 34.) Plaintiffs Richard A. Kong,
Robert A. Cruzalegui, Matthew W. Heiden, and Cashay L.
Clayborn ("Plaintiffs") filed an Opposition (Dkt. No. 35), and
Defendants filed a Reply. (Dkt. No. 36) Pursuant to Rule 78
of the Federal Rules of Civil Procedure and Local Rule 7-15,
the Court finds this matter appropriate for decision without
oral argument.

**I. Factual Background**
Plaintiffs bring this case as a proposed class action under
the Employee Retirement Income Security Act of 1974
("ERISA") § 502(a)(2), (3), 29 U.S.C. § 1132(a)(2), (3).
Plaintiffs are or were participants in Trader Joe's Company
Retirement Plan (the "Plan"), a 401(k) defined contribution,
individual account, employee pension benefit plan. (Dkt. No.
33 ("FAC") ¶ 44.). As of 2018, the Plan had approximately
1.7 billion dollars in assets, and approximately 35,474
participants. (Id. ¶¶ 9, 37.)

According to the Complaint, Trader Joe's is "the Plan
sponsor," and is a "fiduciary of the Plan." (Id. ¶¶ 22-23.)
Trader Joe's allegedly "acted through the Board to perform"
Trader Joe's "Plan-related fiduciary functions." (Id. ¶ 27.)
The Board in turn "appointed members of the Committee,"
and therefore "had the fiduciary duty to monitor and
supervise the Committee while it performed its role as the
fiduciary responsible for selection and monitoring of the
Plan's investments." (Id.) As alleged in the Complaint, the
Committee "is charged with responsibility for selecting an
appropriate mix of investment options available to Plan
participants." (Id. ¶ 30.) "The Committee is tasked with
monitoring the prudence of the Plan investments." (Id.)

Plaintiffs allege that during the proposed Class Period, which
is defined as June 29, 2014 through the date of judgment
Defendants did not act in the best interest of the Plan
participants. Plaintiffs allege Defendants took, or failed to
take, several actions that resulted in a breach of Defendants'
fiduciary duties.

First, Plaintiffs allege that "the majority of funds in the
Plan stayed unchanged during the Class Period." (Id. ¶ 64.)
According to Plaintiffs, "several funds in the Plan have been
in place for at least a decade, going back to 2009." (Id. ¶ 65.)
According to the FAC, these funds were "kept in the Plan
apparently because of the benefit of the Plan's recordkeeper
rather than the Plan participants."

Second, Plaintiffs argue the Plan's investment menu was
not diversified, and that the majority of options in the fund
consisted of "higher-cost mutual funds." (Id. ¶ 71.) Plaintiffs
also allege that "[c]ontrary to all available performance data
on active vs. passive investments, ... the Plan was heavily
weighted in actively managed funds" (Id. ¶ 85.) According
to Plaintiffs, "[t]he Defendants' actions in overwhelmingly
favoring actively managed funds plausibly show[s] that they
failed to consider the pros and cons of offering actively
managed investments vs. passively managed investments."
(Id.) Plaintiffs also argue that "actively managed funds drift
in capitalization and style," which means a "participant may
think that they are buying a Large Cap Blend investment but
they are actually buying an investment that drifts into not just
Large Cap Growth and Value but also Midcap and respective
styles and thus overlapping with other investments." (Id. ¶
90.). According to Plaintiffs, "given the size of the Plan,
Defendants made investments with higher costs (higher
expense ratios) available to participants while the same

investments with lower costs (lower expense ratios) were available." (Id. ¶ 104.)

 **\*2**  Third, Plaintiffs allege the Plan's use of a revenue sharing arrangement was "devastating for Plan participants." (Id. ¶ 121.) According to Plaintiffs, the revenue sharing arrangement "saddled Plan participants with (1) above-market recordkeeping fees and (2) an imprudent method for paying for those fees." (Id. ¶ 122.) Plaintiffs allege that because the revenue sharing arrangement resulted in a balance every year that was paid back to Plan participants, this represented "lost investment opportunity" for participants. (Id. ¶ 125.) Plaintiffs allege that "to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants in a timely manner *or at all*, this was a further fiduciary breach that cost Plan participants millions of dollars during the class period." (Id. ¶ 144.)

Fourth, Plaintiffs argue Capital Research's recordkeeping fee of $48 per participant was "clearly unreasonable as authorities cited in case law confirm that reasonable rates for large plans typically average around $35 per participant." (Id. ¶ 141.) Plaintiffs allege the "Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost." (Id. ¶ 142.)

Fifth, Plaintiff allege Defendants failed to conduct a "Request for Proposal" ("RFP") at reasonable intervals." (Id. ¶ 130.) As alleged in the FAC, a RFP should happen "at least every three to five years as a matter of course." (Id.) Plaintiffs argue that "[t]he fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid the same amount in recordkeeping fees, [leaves] little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time between 2013 and the present – to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers." (Id. ¶ 131.)

Plaintiffs bring claims for: (1) breach of fiduciary duties of loyalty and prudence (against the Committee), and (2) failure to adequately monitor other fiduciaries (against Trader Joe's and the Board). (Id. ¶¶ 149-162.)

## II. **Procedural Background**
On December 30, 2019, this Court received a related case alleging claims involving Trader Joe's company retirement plan. See Marks v. Trader Joe's Company, 19-cv-10942, 2020 WL 2504333 (C.D. Cal. Apr. 24, 2020.) ("Marks"). The Court dismissed that case with leave to amend on April 24, 2020. Id. The plaintiff in Marks failed to file an amended complaint, and the Court subsequently dismissed the case without prejudice. Plaintiffs filed this case on June 29, 2020. On September 24, 2020, the Court granted Defendants' first Motion to Dismiss with leave to amend. (Dkt. No. 32 ("Kong I").) On October 8, 2020, Plaintiffs filed a First Amended Complaint ("FAC"). (Dkt. No. 33.) Defendants subsequently filed the current Motion to Dismiss.

## III. **Legal Standard**
Defendants now seek to dismiss Plaintiff's FAC pursuant to Federal Rules of Civil Procedure (12)(b)(6). Generally, plaintiffs in federal court are required to give only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While the Federal Rules of Civil Procedure allow a court to dismiss a cause of action for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), they also require all pleadings to be "construed so as to do justice," Fed. R. Civ. P. 8(e). The purpose of Rule 8(a)(2) is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

However, in Twombly, the Supreme Court rejected the notion that "a wholly conclusory statement of [a] claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Twombly, 550 U.S. at 561 (second alteration in original) (quoting Conley). Instead, the Court adopted a "plausibility standard," in which the complaint must "raise a reasonable expectation that discovery will reveal evidence of [the alleged infraction]." Id. at 556. For a complaint to meet this standard, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")); see also Daniel v. Cty. of Santa Barbara, 288 F.3d 375, 380 (9th Cir. 2002) ("All allegations of material fact are taken as true and construed in the light most favorable to the

nonmoving party."). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks omitted). In construing the Twombly standard, the Supreme Court has advised that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

## IV. Judicial Notice
 **\*3**  Defendants ask the Court to take judicial notice of exhibits 1 through 7 attached to the Declaration of Catalina Vergara. (Dkt. No. 18.) These exhibits include (1) the Recordkeeping and Administrative Services Agreement between Trader Joe's and Capital Research, and (2) Form 5500s for the Trader Joe's Retirement Plan for the years 2013 through 2018. (Id.) These are the same documents the Court took judicial notice of in Marks and Kong I.

While the Court generally may not consider materials outside of the pleadings when resolving a motion to dismiss, it may consider matters that are properly the subject of judicial notice. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Fed. R. Evid. 201(b). Additionally, the Court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1989), as well as documents referenced extensively in the complaint and documents that form the basis of the plaintiff's claims. Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007).

Here, Plaintiffs do not address Defendants' Request for Judicial Notice. In addition, courts regularly take judicial notice of the types of documents at issue here. See, e.g., Dorman v. Charles Schwab, 17-cv-00285, 2018 WL 6803738, at \*5 (N.D. Cal. Sept. 20, 2018) (taking judicial notice of similar documents). Therefore, the Court finds that judicial notice is appropriate.

## V. Discussion
ERISA Section 404(a)(1) imposes the following duties on plan fiduciaries: the duty of prudence, the duty of loyalty, the duty to diversify the investments, and the duty to act in accordance with the documents and instruments governing the plan. 29 U.S.C. § 1104(a)(1). Plaintiffs allege Defendants breached the duty of prudence and the duty of loyalty.

In accordance with the duty of loyalty, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries – and defraying reasonable expenses of administering the plan." Id. § 1104(a)(1)(A); White v. Chevron Corp. 16-cv-0793, 2016 WL 4502808, at \*4 (N.D. Cal. Aug. 29, 2016). The duty of loyalty prohibits trustees from "engaging in transactions that involve self-dealing or that otherwise create a conflict between the trustees fiduciary duties and personal interests." Restatement (Third) of Trusts § 78 (2007).

ERISA also requires that a pension plan fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Under this "prudent person" standard, courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983). This duty of prudence extends to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones. Tibble v. Edison Intern., 135 S. Ct. 1823, 1828-29 (2015).

### A. Plan Fiduciaries' Process for Selecting Plan Options
Plaintiffs make several arguments to suggest Defendants' fiduciary process for selecting Plan options was flawed, and that it resulted in imprudent investment options. First, Plaintiffs allege it was imprudent for Defendants to leave the majority of funds in the Plan unchanged during the Class

Period. (Id. ¶ 64.) However, nothing in ERISA imposes term limits on retirement plan fund offerings. Further, as the Court previously held, the judicially noticeable facts demonstrate that several changes to the Plan lineup were made during the Class Period. Kong I at *5 ("[T]he judicially noticeable documents show that the Committee made numerous changes to the Plan lineup during the proposed Class Period."). For example, from December 31, 2016 through December 31, 2017, seven fund changes were made: three funds were removed from the list of Plan investment options, and four others were added. (Vergara Decl. Ex. 5 at 159 (2016 Form 5500); Ex. 6 at 195 (2017 Form 5500)). Similar changes were made in other years. (See Id. Ex. 3 at 85 (2014 Form 550); Ex. 4 at 120 (2015 Form 5500)).

**\*4** Next, Plaintiffs argue that the Plan lineup lacked "true diversification." However, the Court has already found – and Plaintiffs have already admitted – that the "Plan offered international equity funds, domestic equity funds, index funds, and non-target date balanced funds." Kong I at *4 n. 1 (citing Compl. ¶ 9.) To rebut this, Plaintiffs argue that the "Plan was heavily weighted in actively managed funds," and that "Defendants' actions in overwhelmingly favoring actively managed funds plausibly show that they failed to consider the pros and cons of offering actively managed investments vs. passively managed investments." (FAC ¶¶ 85, 86.) However, the judicially noticed documents show that the Plan offered both actively managed and passive funds. (Vergara Decl. Ex. 8 at 262 (2019 Form 5500 listing multiple index funds)). This Court finds, like other courts, that "allegations that passively managed funds are available as alternatives to actively managed funds offered in the Plan do not suffice to demonstrate imprudence." Davis v. Salesforce.com, Inc., 20-cv-01753, 2020 WL 5893405, at *3 (N.D. Cal. Oct. 5, 2020). There is nothing imprudent about offering a "concentration of actively managed funds," in particular where a plan "offer[s] a variety of investment options that included low-cost options," like the Plan here did. See Rosen v. Prudential Ret. Ins. & Annuity Co., 15-cv-1839, 2016 WL 7494320, at *15 (D. Conn. Dec. 30, 2016) aff'd 718 F. App'x. 3d (2d Cir. 2017); Chevron, 2016 WL 4502808, at *9 (dismissing imprudence claim despite the presence of five actively managed funds).

Third, Plaintiffs allege the Plan funds "drift in capitalization style," meaning that the actual allocations are different than their intended allocations. (FAC ¶ 90.) Allegations of "overweighting" and "style drift" require looking at "what representations the Plan made to its participants about

the [funds] and whether the [funds] acted in a way so inconsistent with that description that a reasonably prudent investor would have discontinued offering the [funds] as an investment vehicle." In re Disney ERISA Litig., 16-cv-02251, 2017 WL 1505129, at *5 (C.D. Cal. Apr. 21, 2017). Without some connection to the representations made by Plan fiduciaries, claims of imprudence based on alleged style drift or overweighting "would require Plan fiduciaries to monitor the market and publicly available information about every holding maintained by every mutual fund included within the Plan, [and] the concentration of all stocks held by each mutual fund within the Plan.' In re Disney ERIS Litig., 16-02551, 2016 WL 8192945, at *4 (C.D. Cal. Nov. 14, 2016). "Such a duty would not be reasonable or appropriate." Id. Here, Plaintiffs' FAC does not contain any allegations regarding what representations were made to plan participants.

Fourth, Plaintiffs allege that the availability of lower-cost investment options is evidence of an imprudent fiduciary process. Plaintiffs allege "Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds." (Id. ¶ 103.) As the Court previously stated, fiduciaries "have latitude to value investment features other than price (and indeed are required to do so)." Kong I at *4 (quoting Chevron, 2016 WL 4503808, at *10). "ERISA does not require fiduciaries to 'scour the market to find and offer the cheapest possible funds (which might, of course, be plagued by other problems).' " Id.; see also Hecker v Deere & Co., 556 F. 3d 575, 586 (7th Cir 2009) (The "fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."). And where, "as here, a plan offers a diversified array of investment options, the fact that some other funds might offer lower expense ratios is not relevant." Kong I at *4.

Finally, Plaintiffs allege the Plan's funds also exceeded median expense ratios, which suggests impropriety on the part of Plan fiduciaries. (See FAC ¶ 98.) The expense ratios Plaintiffs allege range from 0.35% to 1.05%. (Id.) Several courts have already found that expense ratios that fall within these ranges are reasonable as a matter of law. For example, in Chevron, the plaintiffs alleged a range of expense ratios reaching up to 1.24%. The Court on a motion to dismiss held that "[t]he breadth of investments and range of fees the Plan offered participants fit well within the spectrum that other courts have held to be reasonable as a matter of law." 2016

WL 4502808, at *11; see also, [flag] Tibble I, 729 F.3d at 1135 (affirming reasonableness of fees that reached up to 2%). In addition, the Court again finds that relying on medians or averages is insufficient for the same reasons as those found in Kong I: "the Complaint only alleges 'median' fees, rather than specific fee benchmarks they believe Defendants are required to reach." 2020 WL 5814102, at *4. Plaintiffs again offer nothing more than a "hypothetical scenario suggesting an investor class share in a mutual fund 'may' in general charge an annual expense ratio higher than the institutional class share in the same fund." Marks, 2020 WL 2504333, at *8. That is insufficient to state a claim.

**\*5** The Court finds that Plaintiffs have failed to adequately allege that Plan fiduciaries did not act prudently when selecting Plan investment options.

### B. Share Class Allegations

Second, Plaintiffs allege Defendants "failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds." (FAC ¶ 103.) Plaintiffs allege that the Plan should have offered institutional share classes as opposed to retail share classes. (Id. ¶ 110.) As the Court has already recognized, "fiduciaries have latitude to value investment features other than price (and indeed are required to do so)." Kong I at *4 (quoting Chevron I, 2016 WL 4503808, at *10). "[A]mple authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach." Marks, 2020 WL 2504333, at *9; Chevron Corp., 16-cv-0793, [flag] 2017 WL 2352137, at *11 (N.D. Cal. May 13, 2017) (holding same and that "courts have dismissed claims that fiduciaries are required to offer institutional over retail-class funds, or are required to offer a particular mix of investment vehicles, as well as claims that fiduciaries were imprudent in failing to offer cheaper funds."). "While Plaintiffs have alleged that the institutional share classes were less expensive than the share classes in the Plan, Plaintiffs still do not allege 'whether the investor class share offered other benefits that may have offset any additional costs.' " Kong I at *4. The Court therefore finds Plaintiffs have failed to adequately allege that Plan fiduciaries breached their fiduciary duties by offering retail as opposed to institutional share classes.

### C. The Reasonableness of Capital Research's Recordkeeping Fees

Next, Plaintiffs argue the Plan's "total recordkeeping costs of $48 per participant are clearly unreasonable, as authorities cited in case law confirm that reasonable rates for large plans typically average around $35 per participant." (Id. ¶ 141.) To support this argument, Plaintiffs allege that "even though the number of Plan participants continued to grow from 33,537 to 46,602 between 2013 and 2019, the Plan always paid $48 per-participant in recordkeeping fees." (Id. ¶ 133.) Plaintiffs also point to other plans where participants allegedly paid lower recordkeeping fees. (Id. ¶ 136 ("Nike Inc.'s 401(k) Plan with 19,000 to 26,000 participants paid $21 per participant per year for recordkeeping services in 2012 and 2016.")). Finally, Plaintiffs point to several surveys, including one that "found that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees." (Id. ¶ 139.)

The Court finds Plaintiffs have not offered any facts to suggest that a $48 per participant recordkeeping fee is "unreasonable." "Courts regularly dismiss imprudence claims such as these for failing to allege an adequate market comparison." Kong I. For example, in [flag] Divane v. Nw. Univ., 953 F.3d 980, 990 (7th Cir. 2020) the Circuit affirmed dismissal finding that defendant "was not required to search for a recordkeeper willing to take $35 per year per participant as [p]laintiffs would have liked," and that the plaintiffs "failed to explain how a hypothetical lower-cost recordkeeper would perform at the same level necessary to serve the best interests of the plans' participants." Similarly, in Wilcox v. Georgetown Univ., the court dismissed an imprudence claim where, as here, the complaint alleged without support that the recordkeeping fee should have been $35 annually per participant. 18-cv-00422, 2019 WL 132281, at *11-13 (D.D.C. Jan. 8, 2019). In Wilcox, the court noted that "[w]hile a plaintiff is entitled to the reasonable inferences that may arise from the facts asserted in his complaint, Plaintiffs provide[d] no factual support at all for their assertion that the Plans should pay only $35/year per participant in recordkeeping fees." Id. at 12. "The mere allegation that [Defendants] could continue to offer the same Plan[ ] and the same associated services for $35/year has no factual support, is entirely speculative, contrary to case law and common sense, and does not warrant discovery." Id. at 13.

**\*6** Here, Plaintiffs fail to make any allegations in their FAC as to any dollar figure that would have constituted a reasonable fee or market comparison. In addition, Plaintiffs "do not allege any facts as to what would constitute a reasonable fee, or any facts suggesting that the fee charged

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

by Capital Research is excessive in relation to the services Capital Research provides." Kong 1 at *5; see also 🚩 Young v. GM Inv. Mgmt. Corp., 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor J.) (requiring plaintiffs to "allege that the fees were excessive relative to the services rendered"). The surveys cited by Plaintiffs, as well as evidence of the recordkeeping fees of other plans, have no connection to the question of whether this Plan could have obtained lower recordkeeping fees for the services provided by Capital Research. For example, several of the plans referenced in the FAC have either far more participants with account balances or far greater assets under management than this Plan. (See FAC ¶ 141 n. 30 citing Spano v. The Boeing Co., 6-cv-00743 (S.D. Ill. Sept. 28, 2006) Dkt. No. 1 (alleging plan with almost five times the number of participants). In addition, Plaintiffs do not make any allegations as to whether the services provided to this plan by Capital Research could have been obtained for a lower cost.

Finally, there is no case law supporting that a Plan's administrative fees must be unreasonable if they don't decline over time based on the number of participants. The Court therefore finds that Plaintiffs have failed to adequately allege that Plan fiduciaries breached their fiduciary duty by failing to secure a recordkeeping fee of less than $48.

### D. Placing Revenue Sharing Funds Into a Compensation Recapture Account

Next, Plaintiffs allege that during the Class Period, Plan participants participated in a "compensation recapture program through which recordkeeping fees and other Plan administrative costs were paid." (Id. ¶ 123.) The account was used to pay recordkeeping expenses, "with any excess amount purportedly paid back to the Plan." (Id.) According to Plaintiffs, the "Plan's fiduciaries withheld the revenue for as long as they wanted, distributing it back to Plan participants whenever they wanted and in whatever amount they wanted." (Id. ¶ 124.) As alleged in the FAC, the amount in the recapture accounts at the end of the year, before it was redistributed to Plan participants, reflected "an opportunity cost to participants because they could have used that money to invest in other Plan funds." (Id. ¶ 125.)

As Plaintiffs admit, no ERISA statute or regulation prohibits the use of a recapture account. (See FAC ¶ 121 ("utilizing a revenue sharing approach is not *per se* imprudent"). Again, Plaintiffs do not allege any facts from which one could infer that the recapture account utilized by the Plan was

not in the interest of Plan participants. Plaintiffs allege that Plan fiduciaries held money in the recapture account for "as long as they wanted, distributing it back to Plan participants whenever they wanted and in whatever amount they wanted." (Id. ¶ 124.) However, the judicially noticed documents make clear that the funds deposited in the recapture account were used to pay Plan expenses, including among other things Capital Research's fees, and the remainder was returned to Plan participants. (Vergara Decl. Ex. 1 at 7.) Without more, Plaintiffs "fail to allege any facts from which this Court could infer that the use of a recapture account was not in the interest of Plan participants." Kong I at *5.

### E. Defendants' Alleged Failure to Conduct a Request for Proposal

Plaintiffs allege "the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees paid by other plans, as well as recordkeeping rates that are available," and that this will "generally include conducting a [RFP] process at reasonable intervals." (Id. ¶ 30.) According to Plaintiffs an "RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs." (Id.) Plaintiffs allege the "fact that the Plan has stayed with the same recordkeeper over the course of the Class period, and paid the same amount in recordkeeping fees, [leaves] little to suggest that Defendants conducted a RFP at reasonable intervals." (Id. ¶ 131.)

**\*7** As it did in Marks and Kong I, the Court finds that "nothing in ERISA compels periodic competitive bidding."

Marks at *7 citing Chevron, 🚩 2016 WL 4502808, at \*14 (dismissing duty of prudence claim despite similar competitive bidding allegations); Del Castillo v. Community Child Care Council of Santa Clara County, Inc., 17-cv-07243, 2019 WL 6841222, at \*5 (N.D. Cal. Dec. 16, 2019) ("absence of competitive bidding, ... without more, does not support Plaintiffs' allegations that the [defendants] acted imprudently in violation of § 404(a)(1)(B)").

Here, Plaintiffs have failed to allege any facts from which one could infer that a competitive bidding service would have benefitted the Plan. For example, Plaintiffs have failed to allege any facts showing that the same service might have even been available on the market for less. As the Court previously held, "there are no facts alleged showing that the Plan fiduciaries failed to consider putting the fee structure out for competitive bidding, or failed to negotiate a reasonable fee

structure with Capital Research." Kong I at *7 (citation and internal quotation marks omitted).

Based on the foregoing, the Court finds Plaintiffs have failed to allege sufficient facts to support their duty of prudent claim.

#### F. Plaintiffs' Duty of Loyalty Claim

The Court also finds Plaintiffs do not allege any additional facts to support their duty of loyalty claim outside of those alleged to support their duty of prudence claim. The Court therefore dismisses Plaintiffs' duty of loyalty claim because the Complaint "does not differentiate between breach of the duty of prudence and breach of the duty of loyalty." Chevron, 2016 WL 4502808, at *5; see also Romero v. Nokia, Inc., 12-cv-6260, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (dismissing claim for breach of the duty of loyalty where it did not "present any separate allegations regarding any loyalty breach").

While it is true that ERISA imposes on plan fiduciaries an obligation to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), Plaintiffs have not alleged any facts to suggest that the Plan fiduciaries discharged their duties with anything other than "an eye single to the interest of the participants and beneficiaries." Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir. 1982).

The Court therefore finds Plaintiffs have failed to allege a breach of the duty of loyalty claim.

#### G. Failure to Monitor Fiduciaries

Because Plaintiffs fail to plead a duty of prudence or loyalty claim, their second claim for relief, which is a derivative failure to monitor claim, also fails. See Marks at *8 (citing Chevron, 2016 WL 6803738, at *19 ("because Plaintiffs have failed to plead sufficient facts as to their other allegations, 'they cannot maintain a claim that [Defendants] failed to monitor the fiduciaries' ")); see also Dorman, 2018 WL 6803738, at *7 ("The duty to monitor claim is essentially derivative of the breach of fiduciary duty claim. Because the breach of fiduciary duty cause of action fails to state a claim, this cause of action does as well.").

#### Conclusion

For all of the foregoing reasons, Defendants' Motion to Dismiss is granted. Despite having been granted leave to amend once and following dismissal of a substantially similar case, Plaintiffs added only conclusory allegations that are insufficient to state a claim for breach of the fiduciary duty. In addition, Plaintiffs do not ask for leave to amend, and make no showing that they can allege additional facts should the Court grant Plaintiffs leave to amend. The Court accordingly concludes that granting Plaintiffs leave to amend would be futile. See Thibodeaux v. Teamsters Local 853, 263 F. Supp. 3d 772, 780 (N.D. Cal. June 26, 2017). The Court therefore dismisses Plaintiffs' FAC without leave to amend. The Court will enter a judgment consistent with this Order.

**\*8**  IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 7062395

**End of Document**　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.